## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

**VICTORIA ANN SHANK,**

      *Plaintiff,*

**v.**　　　　　　　　　　　　　　　　　　　**Case No.: 3:17-cv-00572**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**


### PROPOSED FINDINGS AND RECOMMENDATIONS

    This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for supplemental security income ("SSI") under Titles XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings, as articulated in their briefs. (ECF Nos. 13, 16).

    Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Plaintiff's Motion for Judgment on the Pleadings, (ECF No. 13); **GRANT** Defendant's request to affirm the Commissioner's decision, (ECF No. 16); and **DISMISS** this action

from the docket of the Court.

## I.     Procedural History

On March 17, 2014, Plaintiff Victoria Ann Shank ("Claimant"), completed an application for SSI, alleging a disability onset date of September 1, 2008 due to attention deficit disorder, bipolar disorder, and manic depressive disorder. (Tr. at 181, 198). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 12). Claimant filed a request for an administrative hearing, which was held on June 15, 2015 before the Honorable Robert M. Butler, Administrative Law Judge ("ALJ"). (Tr. at 27-74). By written decision dated September 8, 2015, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 12-22). The ALJ's decision became the final decision of the Commissioner on November 15, 2016, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4).

Claimant timely filed the present civil action seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of Proceedings. (ECF Nos.5, 6). Claimant then filed a Brief in Support of Judgment on the Pleadings. (ECF No. 13). In response, the Commissioner filed a Brief in Support of Defendant's Decision to which Claimant filed a Reply. (ECF Nos. 16, 17). Consequently, the matter is fully briefed and ready for resolution.

## II.     Claimant's Background

Claimant was 15 years old at the time of her alleged onset of disability and 22 years old at the time of the ALJ's decision. (Tr. at 194). She has a tenth grade education and communicates in English. (Tr. at 197, 199). Claimant has never been employed; therefore, she has no past relevant work. (Tr. at 198).

### III.   Summary of ALJ's Decision

A claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). For purposes of SSI, a disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful activity. *Id.* § 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of Part 404 of the Administrative Regulations (the "Listing"). *Id.* § 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the

performance of past relevant work. *Id.* § 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experience. 20 C.F.R. § 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, at the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since the date of Claimant's SSI application. (Tr. at 14, Finding No. 1). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "bipolar disorder, generalized anxiety disorder, attention deficit hyperactivity disorder, and personality disorder." (Tr. at 14-15, Finding No. 2). As for the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 15-16, Finding No. 3). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except the claimant is limited to simple, routine and repetitive tasks in an environment free of fast paced production requirements, involving only simple work related decisions and routine workplace changes with no interaction with the general public and only occasional interaction with coworkers.

4

(Tr. at 17-20, Finding No. 4).

At the fourth step, the ALJ determined that Claimant had no past relevant work. (Tr. at 20, Finding No. 5). Therefore, under the fifth and final inquiry, the ALJ assessed Claimant's age and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 20-21, Finding Nos. 6-9). The ALJ noted that (1) Claimant was born in 1993 and was defined as a younger individual on the date the application was filed; (2) she had a limited education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because Claimant had no prior relevant work. (*Id.*, Finding Nos. 6-8). Considering these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, including unskilled work as a sorter, store laborer, price marker, and packager tagger. (Tr. at 21, Finding No. 9). Therefore, the ALJ found that Claimant was not disabled. (Tr. at 22, Finding No. 10).

## IV.    **Claimant's Challenge to the Commissioner's Decision**

Claimant raises two challenges to the Commissioner's decision. First, she contends that the ALJ erred in evaluating her credibility. (ECF No. 13 at 10-15). In particular, Claimant alleges that the ALJ relied only on the objective medical evidence when finding Claimant to be less than fully credible despite legal precedent requiring the ALJ to consider all of the evidence. (*Id.* at 13-15). According to Claimant, the ALJ "parsed the medical evidence" prepared after the date of the application, highlighting clinical notes that showed "slight improvement in symptoms" while "barely" mentioning Claimant's school records and failing to mention at all "her long history of mental health treatment prior to February 2014." (*Id.* at 13).

5

Second, Claimant asserts that the ALJ improperly declined to give deferential weight to the opinions of Claimant's treating psychiatrist, Dr. Anne Zappacosta. (*Id.* at 15-20). Citing to the regulations and rulings governing the weight to be given to a treating source's opinions, Claimant argues that the ALJ violated these mandates by undervaluing Dr. Zappacosta's RFC findings without providing good reasons for doing so. In Claimant's view, the ALJ looked only at Dr. Zappacosta's most recent clinical notes when assessing her opinions, which caused the ALJ to overlook the longitudinal history of Claimant's symptoms. Claimant indicates that she has had only "mixed success at maintaining control of her symptoms"; therefore, the ALJ's analysis was insufficient and his view of her impairments was inaccurate. (ECF No. 13 at 19).

In response, the Commissioner argues that substantial evidence supports the ALJ's determination that Claimant's statements were not entirely credible. (ECF No. 16 at 9-12). The Commissioner contends that the ALJ considered much more than the objective medical evidence in making his credibility finding; such as, Claimant's statements, activities, and medication side effects. The Commissioner posits that the ALJ correctly concluded that Claimant was doing well, her symptoms were controlled, and she required mental health appointments on a less frequent basis. (*Id.* at 11-12).

With respect to the opinions of Dr. Zappacosta, the Commissioner emphasizes the ALJ's authority to give less than deferential weight to a treating source's opinion when the opinion is not well supported by clinical evidence or is inconsistent with other substantial evidence. (*Id.* at 12). The Commissioner asserts that Dr. Zappacosta's RFC findings were clearly inconsistent with her own clinical records, which confirmed that Claimant had only moderate to mild symptoms, not the marked symptoms necessary to justify Dr. Zappacosta's extreme RFC limitations. (*Id.* at 13). The Commissioner notes

6

that the ALJ obviously credited some of Dr. Zappacosta's opinions, because the ALJ included limitations in the RFC finding designed to address Claimant's mental functional deficits. The Commissioner adds that Claimant's argument concerning the longitudinal record is fallacious, because the longitudinal record supports the opposite conclusion. Rather than demonstrating a rocky course that persisted despite treatment, the clinical record reflects Claimant's gradual and sustained improvement over time as she complied with recommended therapies.

## V.  **Relevant Evidence**

The undersigned reviewed all of the evidence before the Court, including the records of Claimant's allegations, her parents' statements, and the health care examinations, evaluations, and treatment. The information that is most relevant to Claimant's challenges is summarized as follows.

### A.  *Statements of Claimant and Her Parents*

In an Adult Function Report prepared on March 26, 2014, Claimant stated that she lived with her parents and spent most of her day laying around and sleeping. (Tr. at 207-08, 214). She had pets that she fed, but relied on her parents to help her with their care. (Tr. at 208). Claimant attended to her own personal grooming, but had little interest in dressing and bathing. Her parents had to remind her to groom and take her medications. (Tr. at 209). Claimant was able to make quick snacks, but her mother did most of the cooking. Claimant occasionally washed the dishes, but did little else due to a reported lack of energy. (Tr. at 209-10). Claimant did not drive or go out alone, had anxiety attacks, avoided shopping, and found money management to be confusing. (Tr. at 210). Claimant stated that her only hobby was watching television, although she admitted to having online friends. (Tr. at 211). She denied being able to follow instructions or pay attention,

explaining that she had attention deficit disorder. (Tr. at 211-12). Claimant indicated that she could not get along with her parents or teachers, which caused her to drop out of school. She complained of having depression and panic attacks. (Tr. at 213).

Claimant's father, Michael Shank, completed a Third Party ADL form on April 28, 2014. (Tr. at 215-22). Mr. Shank stated that his daughter spent her days watching television, sleeping, and playing with her pets. (Tr. at 215). He felt that Claimant had been ill her entire life, indicating that she could not sleep due to anxiety, had little interest in her personal appearance, and did very little around the house. (Tr. at 216-17). Mr. Shank added that Claimant had a difficult time staying on task. (Tr. at 217-18). She did not venture outside on her own, had never driven, and infrequently accompanied her mother to the grocery store. (Tr. at 218). Claimant had some online friends and went to physician appointments; otherwise, she did not socialize. (Tr. at 219). Mr. Shank added that Claimant was easily upset, and stress exacerbated her psychological symptoms. (Tr. at 221).

At the administrative hearing on June 15, 2015, Claimant testified that she had severe depression, which caused her to stay in bed once or twice every couple of weeks. (Tr. at 39). Claimant indicated that she had a few friends at school, but after dropping out, she lost touch with them. All of her current friends were people she met online. Claimant testified that she spent most of her day on the computer. She did not venture out of the house very often. Claimant testified that she did work three part-time days at Suboxicon, a comic book convention held in October 2014 at Huntington's Big Sandy Arena. (Tr. at 40-41). Claimant testified that she enjoyed the convention, but experienced a great deal of stress and had a panic attack on the first day. (Tr. at 42).

Claimant stated that she had suffered from emotional problems since childhood.

(*Id.*). Her psychiatrist, Dr. Anne Zappacosta, wrote prescriptions to manage Claimant's symptoms and counseled her once each month. (Tr. at 42-43). Claimant testified that her appointments with Dr. Zappacosta had decreased with time; however, Dr. Zappacosta had recently left the area, so Claimant was going to have to start treatment with another psychiatrist. (Tr. at 43-44).

Claimant's mother also testified at the hearing. Claimant's mother stated that Claimant would not be able to manage a full-time job, because she was "unable to get up at a set time." (Tr. at 55). According to Claimant's mother, Claimant missed a great deal of school due to her inability to get up and out of bed. Claimant's mother agreed that part of Claimant's problem was lack of motivation, but she also suffered with psychological issues since grade school, and those issues likely caused many of the difficulties experienced by Claimant. (Tr. at 55-57). Claimant's mother testified that she had two other children, who did not exhibit behavioral problems like Claimant, and Claimant's parents had struggled for years trying to find treatment that would help her. (Tr. at 56). Claimant's mother expressed concern over how Claimant would live when her parents died, noting that Claimant showed no desire to seek employment. (Tr. at 56-57). Claimant's mother confirmed that Claimant had no driver's license and only opened a bank account in the course of applying for SSI. (Tr. at 59). She stated that Claimant tended to be combative and disagreeable and spent little face-to-face time with people who were not family members. (Tr. at 58-60). Claimant's mother felt Claimant had improved with Dr. Zappacosta's treatment, but added that Claimant still had severe emotional issues and would require medications for the rest of her life. (Tr. at 60). Claimant's mother confirmed that Dr. Zappacosta originally saw Claimant one time per month, but had reduced the visits to one every three months, because she felt the medications were

working. (Tr. at 65).

### B. School Records

At the age of 9 years, 9 months, Claimant underwent a psychological evaluation ordered by the Cabell County Board of Education due to Claimant's lack of effort and achievement scores that were significantly lower than her assessed cognitive ability. (Tr. at 309-14). At that time, Claimant had good attendance at school and made friends with those in her peer group. (Tr. at 310). Despite receiving average IQ scores on the Wechsler Intelligence Scale for Children, subtests indicated that Claimant had significant problems with concentration. (Tr. at 310-11). She was receiving special education due to poorly sustained concentration and effort. (Tr. at 313). However, Claimant admitted that she stayed up past midnight watching television, which made her tired in the morning. (*Id.*). She did not participate in any sports and preferred sedentary activity. The examining psychologist opined that Claimant's test scores and evaluation were suggestive of attention deficit disorder, or some other medical or emotion problem with similar symptomatology. (Tr. at 314).

Claimant's school records demonstrate a longstanding need for Individualized Education Plans. (Tr. at 247-326). According to school records, Claimant had great difficulty passing the ninth grade due to truancy and lack of motivation. (Tr. at 260). Claimant was evaluated at River Park Hospital and was diagnosed with bipolar disorder and depression. (*Id.*). She began taking medication and attending Innerchange, a program offered by Prestera Centers for Mental Health ("Prestera"). Claimant was unable to stay in the program for the recommended six weeks, however, due to insurance issues. (*Id.*).

In an Individualized Education Plan prepared in ninth grade, the evaluators

identified absenteeism as Claimant's biggest obstacle to success in school. (Tr. at 261). Indeed, Claimant missed as many as half of all instructional days each six-week period. (Tr. at 273). In addition to absenteeism, Claimant showed little interest in changing her approach to school. (Tr. at 261). She refused to engage in interviews or personal interest inventories to identify career paths; instead, she advised that her plan was to quit school at age sixteen. The evaluators opined that Claimant had the ability to complete her course work and pass classes, noting that her grades on core subjects at Innerchange, an alternative school offered by Prestera Centers for Mental Health ("Prestera"), were above average. They recommended that she continue in co-taught courses until she achieved sophomore status and then consider attending classes at the Cabell County Voc-Tech Center for further career training. (Tr. at 262). Of note, at that time, Claimant was placed in general education, rather than special education courses. (Tr. at 269).

### C. Medical Records

On February 28, 2008, a few months shy of her fifteenth birthday, Claimant began individual therapy at Prestera to address her lack of motivation at school. (Tr. at 377). Her mental status was noted to be depressed and cooperative with a blunted affect. (Tr. at 378). On March 7, 2008, Claimant appeared optimistic and less depressed at her counseling session. (Tr. at 379). However, on March 24, 2008, Claimant appeared upset and disheartened over school and over her fractured relationship with her parents. (Tr. at 381). These feelings continued at the next session on April 18, with Claimant being withdrawn and depressed, giving little more than minimal responses to the counselor's questions. (Tr. at 383-84).

On September 23, 2008, Claimant was involuntarily admitted to River Park Hospital in Huntington, West Virginia for depression. (Tr. at 347-55). Claimant allegedly

assaulted her brother and mother, was suspended from school, and refused to receive outpatient treatment. (Tr. at 352). Her physical and neurological examinations were normal. (Tr. at 353-54). Claimant did not receive psychological testing at this time, but was placed on medication to treat her mood swings. She also received family, group, and individual therapy. (Tr. at 349). At the time of discharge, Claimant was diagnosed with bipolar disorder, depressed; and disruptive disorder. (Tr. at 350). Her Global Assessment of Functioning Score ("GAF") was 65.[1] (Tr. at 351). Claimant was told to follow up with Prestera on an outpatient basis and continue to receive counseling from her school counselor. (Tr. at 350).

On November 10, 2008, Claimant expressed frustration at being in counseling sessions, indicating that she was doing better and did not need therapy. (Tr. at 385). She demonstrated poor insight into the effects of her behavior and blamed her parents for her negative actions. Claimant's mood was described as oppositional, guarded, and euthymic, with a broad affect. (Tr. at 386). Claimant was more cooperative on November 24, 2008 and seemed interested in problem solving. (Tr. at 387). She discussed her anger issues and identified several strategies to help control her feelings.

On December 1, 2008, Claimant underwent a psychiatric evaluation. (Tr. at 443-45). She complained of disliking school and stated that she wanted to drop out. She reported a history of being frequently tardy, receiving suspensions, and being placed in

---

[1] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). On the GAF scale, a higher score correlates with a less severe impairment. The GAF scale was abandoned as a measurement tool in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders*, DSM-5, in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM-5 at p. 16. Americ. Psych. Assoc, 32 (5th Ed. 2013). A GAF score of 61-70 indicates the presence of some mild symptoms, but the client is generally functioning pretty well and has some meaningful interpersonal relationships. DSM-IV at 32.

an alternative school. Claimant was loud and hateful during the evaluation and appeared angry and agitated. (Tr. at 443). She stated that she liked to play computer games and ate a lot when bored. Her mood was very dysphoric; her memory was poor; her concentration was poor; and her insight and judgment were poor. (Tr. at 444). Claimant was diagnosed with mood disorder, not otherwise specified; rule out depression versus bipolar disorder; and oppositional defiant disorder, severe; rule out attention deficit hyperactivity disorder. Her GAF score was 40.[2]

On January 7, 2009, Claimant reported to her therapist that she had been suspended from school for not doing her work. (Tr. at 399). She was irritable, but claimed to have less anger. Claimant appeared for individual therapy on February 6, 2009, but was reluctant to discuss her feelings. (Tr. at 389). On February 20, 2009, Claimant was upset with her therapist and failed to make any progress due to her anger. (Tr. at 391-96). Claimant received individual therapy on February 24, February 26, March 10, March 13 to discuss her anger issues, family discord, progress at school, and her dislike of therapy sessions. (Tr. at 374, 376, 395, 398, 401).

On March 20, 2009, Claimant was discharged from Prestera's Innerchange program due to a lack of progress. (Tr. at 362-63). Claimant reportedly resisted change, was not motivated to stay in school, and often refused to go to class or participate in group sessions. She wanted to drop out of school and stop treatment. (*Id.*). On March 24, 2009, Claimant appeared irritable, grouchy, and sarcastic, although she described her mood as "good." (Tr. at 402). She complained of decreased attention in class.

---

[2] A GAF score of 31-40 indicates that the patient had some impairment in reality testing or communication (e.g. speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g. depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). DSM-IV at 32.

Claimant repeated her dislike of therapy on March 26, 2009, indicating that she was annoyed at being called out of class at school to attend the session. (Tr. at 393). At her session on April 27, 2009, Claimant reported having an eventful week, which included her threatening to commit suicide and missing school due to fear over school shootings. (Tr. at 403). She appeared irritable and displayed an inappropriate affect. Claimant reiterated her desire to drop out of school at age 16. (Tr. at 404). On April 30, 2009, Claimant was discharged from Prestera's counseling services, because she continued to refuse therapy; however, the plan was to maintain her medication regimen. (Tr. at 364-65). On July 21, 2009, Claimant was described as "very hateful and sarcastic (as always)." (Tr. at 405). She felt "down in the dumps" on October 7, 2009, and complained of having trouble sleeping. (Tr. at 406). However, Claimant had started a GED program.

In 2010, Claimant had eight medication management sessions with Dr. Anne Zappacosta, a psychiatrist at Prestera. On January 6, 2010, Claimant was angry and irritable, but reported sleeping better. (Tr. at 407). On March 2, 2010, Claimant was less depressed and more empathetic. (Tr. at 408). Her father remarked that Claimant's mood had improved over the past year and a half. On April 19, 2010, Claimant was feeling better. (Tr. at 409). She had passed a pre-GED test, except for math. On June 22, 2010, Claimant reported that she heard voices, was paranoid, and slept with the light on at night. (Tr. at 410). She expressed concern that she was schizophrenic. At her next medication management session on July 20, 2010, Claimant's appearance, speech, thought content, and memory were all within normal limits. (Tr. at 461-62). She was oriented and gregarious, although her affect was labile. Claimant's coping ability was deficient. Dr. Zappacosta diagnosed Claimant with episodic mood disorder, not otherwise specified and

gave her a GAF score of 60.[3] At her October session, Claimant reported leaving GED classes due to a panic attack. (Tr. at 465). She also complained that her depression was worse. Claimant was withdrawn, but her speech, appearance, and thought content were normal. She also had a normal coping ability and recall memory. (Tr. at 466). Claimant's diagnosis and GAF score did not change. (Tr. at 467). Her medications were increased and an additional medication was added. Therapy was recommended, but Claimant wanted to think about it before agreeing to attend. (*Id.*).

On November 11, 2010, Dr. Zappacosta readjusted Claimant's medications after she had a meltdown at home. (Tr. at 469-70). Claimant's father had taken away her laptop when she failed to go to school, and she reacted by damaging objects in her room. Her appearance, sociability, speech, thought content and memory were normal at this visit, but her affect was labile and her coping ability was deficient. Claimant complained of having auditory and visual hallucinations. Nevertheless, her diagnosis and GAF score remained the same. (Tr. at 471). On December 8, 2010, Claimant complained to Dr. Zappacosta about hearing voices when left alone. (Tr. at 473). However, she reported feeling less depressed and anxious when taking her medications. Her diagnosis and GAF score were unchanged. (Tr. at 475).

Claimant's condition was essentially the same at her next six medication management sessions on January 13, 2011; March 28, 2011; April 28, 2011; May 26, 2011; June 30, 2011; and August 29, 2011. (Tr. at 477-500). On October 27, 2011, Claimant appeared much improved. (Tr. at 501-04). She reported having a new online boyfriend and getting along better with her family. She no longer felt anxious and had gone shopping

---

[3] GAF scores between 51 and 60 indicate "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

15

for new clothes and make-up with her mother. She also had a manicure and her hair done. (Tr. at 501). Dr. Zappacosta diagnosed Claimant with episodic mood disorder, not otherwise specified; generalized anxiety disorder; and personality disorder, not otherwise specified. (Tr. at 503). Claimant's GAF score remained at 60. (Tr. at 504). She was told to return in two months.

Claimant returned to Prestera on January 24, 2012. (Tr. at 505). She had broken up with her boyfriend, but seemed to be stable. (Tr. at 505-06). Her mental status examination was entirely normal. There were no changes in Claimant's diagnoses or GAF score. (Tr. at 507). On March 27, 2012, Claimant reported to Dr. Zappacosta that she had stopped taking Abilify, because another physician, Dr. Tackett, did not believe Claimant was bipolar. (Tr. at 509). Dr. Tackett placed Claimant on Celexa instead and suggested that the bipolar diagnosis be revisited. Dr. Zappacosta questioned Dr. Tackett's knowledge of Claimant's history, so she did not change Claimant's diagnoses or her GAF score, but allowed her to remain on Celexa. (Tr. at 511). On April 23, 2012, Claimant suggested that she might need a mood stabilizer to deal with her older brother, who was expected to return home in the near future. (Tr. at 513). Dr. Zappacosta added Topamax to Claimant's prescription of Celexa. (Tr. at 515).

In June 2012, Claimant advised Dr. Zappacosta that Topamax was helping with her mood and appetite, although she was not taking the full dosage prescribed. (Tr. at 517). She described feeling happy, despite having stopped her prescription of Celexa. Claimant's mental status examination was normal, and her diagnoses and GAF core were unchanged. (Tr. at 518-19). On September 20, 2012, Claimant reported feeling more emotional, more depressed, and somewhat paranoid. (Tr. at 520). She told Dr. Zappacosta that she had dropped out of GED classes. Dr. Zappacosta noted that Claimant

had unilaterally stopped taking Celexa and was only taking half the prescribed dosage of Topamax. Claimant's mental status examination was normal and her diagnoses and GAF score remained the same. (Tr. at 521-22). Dr. Zappacosta restarted Celexa, prescribed Klonopin to be taken as needed, and instructed Claimant to take the full dosage of Topamax. On her return in October, Claimant stated that Klonopin helped her sleep, but she still felt "unbalanced." (Tr. at 523). She admitted that she was not taking Topamax as prescribed and had not yet restarted Celexa. (Tr. at 523, 525). Claimant's complaints and symptoms were unchanged on her next medication management session in November 2012. (Tr. at 526-28). On November 29, 2012, Claimant attended an initial individual therapy session at Prestera. (Tr. at 453). She discussed feelings of distress over a recent breakup with her boyfriend. On December 27, 2012, Claimant discussed the impact her friends' behavior had on her mood. (Tr. at 454). She appeared less anxious, however, and stated that she felt better eliminating negative people from her life.

Claimant had nine medication management and six individual therapy sessions in 2013: January 22, February 13, February 22, March 13, March 22, April 24, May 3, June 21, June 27, July 25, August 6, August 27, September 17, October 29, December 3 (Tr. at 455-60, 532-72). On January 22, 2013, Claimant attended individual therapy. She described feeling depressed for about a week, ruminating about all of the things she had not accomplished, like taking her GED and getting a driver's license. (Tr. at 455). In a February medication management session, Claimant complained of having trouble focusing on activities. Her mood had been stable, though, and she was getting along better with her mother. She felt therapy was helping. (Tr. at 534). Her diagnoses and GAF score were unchanged. (*Id.*) Claimant's anxiety had increased on February 22, 2013 as she grappled with friendship drama. (Tr. at 456). On March 13, Claimant was in a "great

mood," with less anxiety, reporting that she was involved in a new relationship. (Tr. at 536). Her friendship issues had returned, however, and were the topic of discussion at her March 22, 2013 session. (Tr. at 457).

By April, Claimant was depressed again, because her relationship had ended. (Tr. at 541). She started cutting herself. On examination, her mental status was normal, so Dr. Zappacosta did not change Claimant's diagnoses or GAF score, but added lithium to her medication regimen. (Tr. at 543). On May 3, 2013, Claimant reported that her depression continued to result in self-mutilation. (Tr. at 458). At a therapy session on June 21, 2013, Claimant appeared tired, but seemed intent on avoiding negative thoughts. (Tr. at 459). She had broken ties with a girlfriend, which had been hard, but she was feeling a little bit better. On June 27, 2013, Claimant reported to Dr. Zappacosta that things had been difficult, because her grandmother died. (Tr. at 545). Claimant had not been sleeping well, but appeared less depressed and her mental status examination was normal. (Tr. at 545-46).

Claimant had improved by July, reporting that she was back together with her significant other. (Tr. at 550). She had been taking clonidine for attention deficit disorder and felt the medication helped her sleep. She was in a good mood. Her diagnoses and GAF score were unchanged. (Tr. at 551-52). Claimant's condition was essentially the same in August, although she reported being somewhat more depressed. (Tr. at 554-56). Dr. Zappacosta increased the dose of lithium for better mood stabilization. (Tr. at 556). Claimant admitted to her therapist on August 27, 2013 that she continued to struggle with controlling negative thoughts. (Tr. at 460). She stated that she could not think positively when she was depressed, because that was being "fake." (*Id.*). In September, Claimant felt stable, good, and confident. (Tr. at 558). She had been dealing with life stressors, but was

18

making plans for the future. In October, Claimant reported that her grandfather had died, and she felt stressed, but she was getting out of the house more often. (Tr. at 563). Her medications were continued with an increase in the dose of lithium. (Tr. at 566). Claimant displayed a stable mood on December 3, 2013. She had a new boyfriend and was getting a new gaming system for Christmas. (Tr. at 568). Dr. Zappacosta continued Claimant's medications. (Tr. at 571).

In 2014, Claimant attended seven medical management sessions: January 30, February 27, April 24, June 24, August 21, October 14, and November 17. (Tr. at 573-81, 600-31). In January, Claimant reported to Dr. Zappacosta that she had enjoyed the holidays and was considering working at Suboxicon. (Tr. at 573). Her mood was fairly stable and her diagnoses remained the same. (Tr. at 573-75). In February, Claimant reported that she was applying for SSI. (Tr. at 578). On April 24, 2014, Claimant told Dr. Zappacosta that she was chatting with people online. (Tr. at 600). She also mentioned having been evaluated for SSI and felt that the assessment went well. Claimant's mood was good, and her mental status examination was unremarkable. Her medications were continued. (Tr. at 603).

Claimant remained stable on June 24, 2014. (Tr. at 605). Her depression and anxiety were under control. Dr. Zappacosta documented that Claimant was more forthcoming during the sessions and was developing coping skills. (Tr. at 608-09). Claimant reported that she was "doing okay" overall. (Tr. at 610). She was planning a beach vacation with her family. Claimant's mental status examination, diagnoses, and GAF score were unchanged. (Tr. at 610-12). In August, Claimant reported having fun at the beach. (Tr. at 615). She also went to a movie with her brother, which she enjoyed. Claimant was considering working at a Halloween store, working at Suboxicon, and

taking online high school courses to obtain a diploma, rather than a GED. Claimant was not having signs or symptoms of depression. (*Id.*).

On October 14, 2014, Claimant stated that she had done "really well" at Suboxicon. (Tr. at 619). She had one panic attack, but was able to control her symptoms and worked all three days of the event. She even confronted an individual trying to sneak into the convention. Claimant did notice, however, that she had trouble concentrating and wondered if she had attention deficit disorder. Claimant appeared happy and was proud of herself for working through a difficult situation. Dr. Zappacosta reviewed Claimant's old treatment records with her, and Claimant commented about her past, stating that "she was just an ordinary teen who hated everyone and everything." (*Id.*). In November, Claimant's mother reported that Claimant had not had any more panic attacks. (Tr. at 624). They tried to fill a prescription of Adderall to treat Claimant's attention deficit disorder; however, they could not work out the insurance coverage. Claimant was spending time hanging out with her brothers, watching television, and playing Minecraft on the computer. (*Id.*). Claimant appeared to be improving at this time and her comorbidities were stable. (Tr. at 628).

Claimant also presented to the office of her primary care physician on four occasions in 2014. In February 2014, Claimant reported that her bipolar disorder was "under pretty good control." (Tr. at 666). She denied cutting herself and stated that she was feeling pretty well overall. (*Id.*). On August 4, 2014, Claimant's mood and affect were normal and, two days later, she was oriented to person, place, and time, but appeared slightly nervous. (Tr. at 662, 665). On September 19, 2014, Claimant reported that her depression was under good control, that she was "doing great," had no sadness, and was "happier in mental capacity now than [in] a very very long time." (Tr. at 655, 659).

### D. Evaluations and Opinions

On April 16, 2014, John Todd, Ph.D., an agency consultant, completed a Psychiatric Review Technique. (Tr. at 78-79). Dr. Todd considered Claimant's mental impairment under three listings: 12.04—affective disorders; 12.06—anxiety related disorders; and 12.08—personality disorders. He found that Claimant was markedly restricted in activities of daily living and maintaining social functioning; was mildly limited in maintaining concentration, persistence, or pace; and had one or two episodes of decompensation of extended duration. (Tr. at 78). He felt that Claimant was credible and her symptoms met the criteria of listing 12.08. He explained that Claimant's violent tendencies, attitude toward others, mood shifts, and reaction to requests and prompts continued to be severe despite medical treatment. (*Id.*)

On April 21, 2014, H. Hoback Clark, M.D., prepared a Case Analysis for the SSA. (Tr. at 589-90). She noted Claimant's allegations of bipolar disorder and attention deficit disorder. She reviewed the treatment received by Claimant for those conditions, as well as for her depression, oppositional defiant disorder, and anxiety. Dr. Hoback considered the opinions provided by Dr. Todd, but disagreed with his assessment that Claimant met a listed impairment. Dr. Hoback indicated that Dr. Todd's assessment contained many inconsistencies. For that reason, Dr. Hoback suggested obtaining a mental status abstract from Claimant's treating psychiatrist and an assessment of Claimant's activities of daily living to determine her functional capacity. (*Id.*).

Two days later, Dr. Zappacosta completed a form supplied by the Disability Determination Section, which requested additional information regarding Claimant's condition and treatment. (Tr. at 591). Dr. Zappacosta listed all of the medications she was prescribing for Claimant and confirmed the diagnoses of bipolar disorder-manic,

21

depression; psychosis with positive suicidal ideations; and generalized anxiety disorder. Dr. Zappacosta opined that Claimant's mental impairments caused functional impairment and interfered with Claimant's ability to work. In support, Dr. Zappacosta pointed out that Claimant had been unable to finish high school or obtain a GED and was slow to trust. (*Id.*).

On May 28, 2014, Claimant was evaluated by Rachel Arthur, M.A., at the request of the SSA. (Tr. at 592-96). Ms. Arthur's evaluation included a client and parent interview and a mental status examination. Claimant was neatly dressed and cooperative at her interview. (Tr. at 592). She was transported to the evaluation by her mother, because she did not have a driver's license. Claimant indicated that she applied for SSI, because she was severely depressed and could not take care of herself. (*Id.*). She described having mental health problems since childhood, with depression starting in her adolescence, adding that "[e]verything started going downhill in middle school really." (*Id.*). Claimant stated that she had never worked and did not think she could handle the stress associated with working. She reported have longstanding difficulty with concentration and sleep. (*Id.*)

Claimant's mother advised Ms. Arthur that Claimant started having trouble in the second grade. Claimant's mother enrolled Claimant in Sylvan, but Claimant refused to go back after six weeks. (Tr. at 592-93). Claimant's parents began spending time at the school trying to deal with Claimant's problems; such as, her failure to complete assignments. (Tr. at 593). Claimant added that she was institutionalized at River Park Hospital when she was 14 years old because of major depression. She began to isolate herself, had feelings of worthlessness and guilt, and recurrent thoughts of death. (*Id.*). Claimant reported having periods when her depression was in remission, but denied having a full remission of

symptoms for any extended period of time. She described having manic periods recently, which lasted a couple of days, but then she would fall back into a depression. Claimant stated that her depression had improved a bit, but she still had no energy. She felt her improvement was due to lithium. (*Id.*).

Claimant also complained of anxiety, which made her feel "keyed up" or on edge. (Tr. at 593). She felt particularly anxious in social situations, reporting a history of domestic abuse by a romantic partner. (*Id.*). Stressful situations and large groups of people triggered panic attacks. Claimant advised that she had been diagnosed with attention deficit hyperactivity disorder as a child, and her symptoms included talking loudly, talking excessively, interrupting others, making careless mistakes in school work, difficulty staying on tasks, difficulty listening, being impulsive, and fidgeting. (*Id.*). Claimant's mother indicated that Claimant was easy to anger and was combative, although lithium seemed to reduce those symptoms.

Ms. Arthur reviewed Claimant's psychiatric history, confirming her diagnoses, prior treatment, and counseling. (Tr. at 594). Claimant reported a history of sporadic heavy drinking, but stated that she now had that problem under control. With respect to her educational history, Claimant confirmed that she completed the ninth grade after repeating it. (*Id.*). She had frequent behavioral issues and would often skip class. Claimant had no criminal history, however.

On mental status examination, Claimant interacted appropriately and had good eye contact. (*Id.*). Her verbal responses were profuse, but her rate of speech was normal and her speech was logical and coherent. Claimant was fully oriented, had a euthymic mood, full affect, and appropriate thought content. Her insight and judgment were gauged to be adequate. Claimant's immediate and remote memory were normal, although

her recent memory was mildly deficient. (Tr. at 595). Her concentration was normal, as was her psychomotor activity.

Ms. Arthur diagnosed Claimant with bipolar II disorder and anxiety disorder, not otherwise specified. (*Id.*). Ms. Arthur did not believe that Claimant had attention deficit disorder; rather, her symptoms were likely due to bipolar disorder. Ms. Arthur also felt that personality disorder was possible; however, the overlap of symptoms between that condition and bipolar disorder made it difficult to determine. Ms. Arthur felt Claimant's prognosis was fair to poor. (*Id.*).

Considering Claimant's daily activities, Ms. Arthur documented that Claimant spent most of her day socializing on the internet, watching television, and playing video games. She devoted considerable time to moderating an online gaming group, stating that her "friends keep me happy." (*Id.*). Claimant performed her own grooming and hygiene with occasional prompts. She enjoyed baking, reading, and collecting comic books. (Tr. at 596). Claimant's mother reported that Claimant did not do chores and generally lacked responsibility for herself. (*Id.*). She had no driver's license or bank accounts and relied on her mother to do the shopping. Ms. Arthur noted that Claimant's social functioning during the evaluation was normal, although she denied engaging in face-to-face social activities, stating her social interaction was confined to the computer. Claimant described herself as: "I'm awkward at first but when I get to know the person, I talk and I'm comfortable." (*Id.*). Ms. Arthur opined that Claimant's pace and persistence were normal, and she was capable of managing finances. (*Id.*).

On June 6, 2014, Dr. Todd prepared a second Psychiatric Review Technique taking into consideration the evaluation performed by Ms. Arthur. (Tr. at 85-86). Based upon Ms. Arthur's findings and observations, Dr. Todd revised his opinions. He found Claimant

to be markedly restricted in activities of daily living; moderately limited in maintaining social functioning; mildly limited in maintaining concentration, persistence, or pace; and she had no episodes of decompensation of extended duration. (Tr. at 85). He found no evidence of paragraph "B" or "C" criteria and did not find that Claimant met any listed impairment. Dr. Todd acknowledged that Claimant continued to have mood swings and depression that significantly impaired her function. He suggested that these issues might indicate an inability to follow through on work-like tasks on a sustained basis; however, he felt that a mental residual functional capacity evaluation should be completed to assess Claimant's functioning. (*Id.*). Dr. Todd opined that Claimant was only partially credible and appeared to exaggerate her symptoms. (Tr. at 86).

On the same day, Dr. Todd completed a mental residual functional capacity assessment. (Tr. at 87-88). He opined that Claimant had no understanding or memory limitations, but did have sustained concentration and persistence limitations. (Tr. at 87). He found Claimant not to be significantly limited in: carrying out short and simple instructions; maintaining concentration and attention for extended periods; sustaining an ordinary routine without special supervision; making simple work-related decisions; asking simple questions; requesting assistance; accepting instructions and criticism from supervisors; and getting along with co-workers without distracting them or exhibiting behavioral extremes. (Tr. at 87-88), He found Claimant to be moderately limited in the ability to: carry out detailed instructions; perform within a schedule; maintain regular attendance; be punctual; complete a normal workday or work week without interruption from psychologically-based symptoms; perform at a consistent pace; interact appropriately with the general public; maintain socially appropriate behavior; and adhere to basic standards of neatness and cleanliness. (*Id.*). He explained that Claimant had poor

follow-through and task persistence and required limited production demands and limited contact with others. (Tr. at 87). He also noted that Claimant was quick to anger and occasionally failed to attend to her personal grooming, which also required limited contact with others. (Tr. at 88). In summary, Dr. Todd felt Claimant was capable of simple work with limited contact with others. (Tr. at 89). Dr. Todd's June 6, 2014 Psychiatric Review Technique and Mental Residual Functional Capacity assessment were affirmed on August 8, 2014 by agency consultant, Paula J. Bickham, Ph.D. (Tr. at 96, 98).

On August 26, 2014, Dr. Zappacosta completed a Mental Assessment of Ability To Do Work-Related Activities form and a Physical Residual Functional Capacity Questionnaire. (Tr. at 632-40). Dr. Zappacosta found Claimant to have extreme limitations in dealing with the public and with work stresses; marked limitations in relating to co-workers and supervisors, functioning independently, and maintaining concentration and attention; moderate limitations in using judgment; and no limitations in following work rules. (Tr. at 633). Dr. Zappacosta based these opinions on Claimant's diagnoses of bipolar disorder and social anxiety. She also felt that Claimant was markedly impaired in understanding, remembering, and carrying out complex instructions; and moderately impaired in understanding, remembering, and carrying out both detailed and simple instructions. Dr. Zappacosta arrived at these findings based on Claimant's limited education. (*Id.*). Dr. Zappacosta felt Claimant could maintain her personal appearance, but was markedly limited in her ability to behave in an emotionally stable manner and extremely limited in her ability to relate predictably in social situations and complete a normal work day and work week without interruptions from psychologically based symptoms. (Tr. at 634). Claimant was also extremely limited in the ability to perform at a consistent pace without an unreasonable number and length of rest periods. Dr.

26

Zappacosta pointed out that Claimant could not finish high school or a GED program, could not drive, and rarely left her home. Nevertheless, she found Claimant capable of managing any benefits she might receive. (*Id.*)

In the physical RFC assessment form, Dr. Zappacosta indicated that she had been treating Claimant once or twice per month since December 2008. (Tr. at 635). She opined that Claimant was not a malingerer and her psychiatric conditions were expected to last a lifetime. According to Dr. Zappacosta, Claimant was not capable of even "low stress" jobs due to her anxiety, depression, personality disorder, and bipolar disorder. (Tr. at 636-37). Dr. Zappacosta estimated that Claimant would miss more than four days of work per month due to her mood swings, which ranged from depression to hypomania. (Tr. at 640). Dr. Zappacosta did not believe that Claimant was capable of working a full-time work schedule at any level of exertion. (*Id.*).

## VI.    <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589

(4th Cir. 1996)). Rather, the Court's role is limited to ensuring that the ALJ followed applicable regulations and rulings in reaching his or her decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.    <u>Discussion</u>

As previously stated, Claimant raises two challenges to the propriety of the Commissioner's decision. Each challenge is addressed in turn below.

### *A. Reliability of Claimant's Statements*

Claimant, her mother, and her father all provided statements to the SSA regarding Claimant's level of functioning. The ALJ considered the statements and concluded that while they verified the existence of functional limitations related to Claimant's psychiatric conditions, they did not establish that the limitations were disabling. (Tr. at 19-20). When assessing the statements in context with the other evidence of record, the ALJ determined that Claimant's mental impairments restricted her to work that was simple and routine, was free of stressful production requirements, did not involve anything other than simple decisions and routine workplace changes, did not require Claimant to interact with the public, and only exposed her to occasional contact with coworkers. (Tr. at 17). The undersigned **FINDS** that substantial evidence supports the ALJ's credibility determination. Furthermore, the undersigned **FINDS** that the ALJ complied with governing rules and regulations in assessing the credibility of Claimant's statements.

An ALJ evaluates statements regarding the severity, persistence, and disabling effects of symptoms using a two-step process. First, the ALJ must assess whether the claimant's medically determinable medical and psychological conditions could

reasonably be expected to produce the alleged symptoms. 20 C.F.R. § 416.929(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016).[4] Instead, there must be some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* § 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources, 20 C.F.R. § 416.929(c)(1); (2) objective medical evidence, which is obtained from the application of

---

[4] SSR 16-3p supersedes SSR 96-7p, 1996 WL 374186, which was in place and relied upon by the ALJ when he conducted his credibility assessment. However, the undersigned finds it appropriate to consider Claimant's challenge under the more recent Ruling as it "is a clarification of, rather than a change to, existing law." *Matula v. Colvin*, No. 14 C 7679, 2016 WL 2899267, at *7 n.2 (N.D. Ill. May 17, 2016); *see also Morris v. Colvin*, No. 14-CV-689, 2016 WL 3085427, at *8 n.7 (W.D.N.Y. June 2, 2016).

medically acceptable clinical and laboratory diagnostic techniques, *id.* § 416.929(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* § 416.929(c)(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7. The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

SSR 16-3p provides further guidance on how to evaluate a claimant's statements regarding the intensity, persistence, and limiting effects of his or her symptoms. For example, the Ruling stresses that the consistency of a claimant's own statements should be considered in determining whether a claimant's reported symptoms affect his or her ability to perform work-related activities. *Id.* at *8. Likewise, the longitudinal medical record is a valuable indicator of the extent to which a claimant's reported symptoms will reduce his or her capacity to perform work-related activities. *Id.* A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms may support a claimant's report of symptoms. *Id.* On the other hand, an ALJ "may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record," where "the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints," or "the individual fails to follow prescribed treatment that might improve symptoms." *Id.*

SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person"; rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. In other words, the ALJ must discuss "which evidence the ALJ found credible [or not credible] and why" and must "build an accurate and logical bridge from the evidence to his [credibility] conclusion." *Monroe v. Colvin,* 826 F.3d 176, 189 (4th Cir. 2016) (citations and markings omitted).

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the

weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Moreover, because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

In this case, the ALJ considered Claimant's allegation that she was unable to work due to her psychiatric symptoms. The ALJ examined Claimant's statements regarding her activities, depression, and mental health treatment. He noted that Claimant's frequency of visits with her psychiatrist has decreased in the months after she filed her application for SSI. (Tr. at 17). The ALJ also reflected on the statements by Claimant's parents, who confirmed Claimant's longstanding problem with truancy, her self-imposed isolation, her inability to stay on task, and her dependence on family members. (Tr. at 15, 18, 19). The ALJ acknowledged that these statements established the presence of functional limitations. However, the ALJ also took note of testimony offered by Claimant's mother in which she confirmed that Claimant's symptoms had improved with regular treatment consisting of both medication and therapy.

Contrary to Claimant's assertion, the ALJ clearly considered the longitudinal record, acknowledging Claimant's educational reports, intelligence testing, and hospitalization for bipolar disorder. (Tr. at 18). Notwithstanding the history, the ALJ very clearly pointed out that the clinical records prepared in 2014, which was the relevant period for SSI benefits, showed significant improvement from Claimant's prior condition, and this improvement undermined allegations that her symptoms remained debilitating. To further support his conclusion, the ALJ methodically reviewed clinical notes from 2014, highlighting how they contradicted Claimant's statements. (Tr. at 18-19).

In addition, and also contrary to Claimant's contention, the ALJ considered more than just "objective evidence." Indeed, much of the ALJ's analysis consisted of comparing and contrasting Claimant's *subjective* statements to the SSA with her *subjective* statements to treating and consulting physicians. Moreover, the ALJ examined Claimant's activities, indicating that despite her claims of poor concentration, Claimant was able to spend long hours playing computer games and watching television. Similarly, regardless of her claims of social isolation, Claimant had online friends, acted as the mediator of a gaming group, and worked at Suboxicon, which was a "highly social setting." (Tr. at 19). The ALJ carefully built a logical and accurate bridge from the evidence to his conclusion. His message was both simple and clear—Claimant's symptoms, which were severe in her youth, had decreased, and her overall ability to function had increased during the year or two before the administrative hearing. As such, during the relevant period, Claimant's symptoms were not disabling.

Substantial evidence supports the ALJ's finding. The longitudinal record shows that Claimant was significantly affected by her mental illness as an adolescent; however, as she matured and accepted psychiatric treatment, Claimant's outlook, behavior, and state-of-mind substantially improved. Claimant essentially admitted as much when she and Dr. Zappacosta discussed the records of Claimant's first years of therapy. Claimant acknowledged her prior bad behavior and attributed it to her being an ordinary teenager who hated everything and everyone. (Tr. at 619). During the administrative hearing, the ALJ questioned Claimant's mother at length regarding Claimant's activities and behavior, both before and after she began receiving consistent treatment. (Tr. at 60-65). Through this exchange, Claimant's mother agreed that medication and therapy were helping Claimant and that her psychiatric appointments had lessened. (*Id.*).

The clinical notes verify Claimant's gradual and progressive improvement. Early in 2013, Claimant was depressed enough to self-mutilate. (Tr. at 541). However, by June 2013, she was intent on avoiding negative thoughts. (Tr. at 459). In July, Claimant was coping with the loss of her grandmother, but she appeared less depressed and had a normal mental status examination. (Tr. at 545-46). Claimant continued to improve in July and felt stable, confident, and good in September. (Tr. at 550, 558). Claimant lost her grandfather in October, which caused situational stress, but she was less isolated by getting out of the house more often. (Tr. at 563). Claimant had started a new romantic relationship and displayed a stable mood in December 2013. (Tr. at 568).

In January 2014, Claimant remarked that she had enjoyed the holidays and was considering working at the Suboxicon convention. (Tr. at 573). Claimant applied for SSI in February 2014, although her mental status examination was essentially normal, her mood was pretty good, and she reported that she was working on hair dyes and collecting dolls. (Tr. at 578-79). Claimant's GAF score remained at 60, indicating only moderate to mild symptoms. (Tr. at 580).

In April 2014, Claimant advised Dr. Zappacosta that she was chatting with people online, her mood was good, and her mental status examination was normal. (Tr. at 603). Claimant remained stable in June. Dr. Zappacosta noted that Claimant's depression and anxiety were under control, she was more forthcoming at the sessions, and she was developing coping skills. Claimant was planning a beach vacation with her family. (Tr. at 605-09). In August, Claimant reported having fun at the beach and stated that she was considering getting a job. She had no signs or symptoms of depression. (Tr. at 615). In September, Claimant told her primary care physician that she was doing great, had no sadness, and was "happier in mental capacity now than [in] a very very long time." (Tr. at

659). Claimant reported to Dr. Zappacosta in October that she had worked at Suboxicon, and although she had a panic attack, she was able to persevere and stayed all three days of the convention. (Tr. at 619). In November 2014, Claimant's mother confirmed that Claimant was no longer having panic attacks. (Tr. at 624). She was spending time with her brothers, playing Minecraft, and watching television. All of these clinical records demonstrate a vast improvement in Claimant's overall functioning.

Therefore, the ALJ's credibility analysis was properly conducted in compliance with the applicable mandates, and his determination was supported by substantial evidence.

### B.  Weight Given to Dr. Zappacosta's Opinions

Claimant contends that the ALJ failed to properly weigh the RFC opinions submitted by her primary treating psychiatrist, Dr. Anne Zappacosta. When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. § 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* § 416.927(a)(2).

The regulations outline how the opinions of accepted medical sources should be weighed in determining whether a claimant qualifies for disability benefits. *Id.* § 416.927(c). For claims filed prior to March 27, 2017 (such as Claimant's), the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source, and even greater weight to the opinion of a treating physician,

35

because that physician is usually most able to provide a detailed, longitudinal picture of a claimant's alleged disability. *Id.* § 416.927(c)(1)-(2). A treating physician's opinion on the nature and severity of an impairment may be afforded controlling weight when the following two conditions are met: (1) the opinion is well-supported by clinical and laboratory diagnostic techniques and (2) the opinion is not inconsistent with other substantial evidence. *Id.* When a treating physician's opinion is not supported by clinical findings, or is inconsistent with other substantial evidence, the ALJ may give the physician's opinion less weight.  *Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must analyze and weigh all the medical opinions of record, taking into account the following factors: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. 20 C.F.R. § 416.927(c)(1)-(6). The ALJ must provide "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record." SSR 96-2p, 1996 WL 374188, at *5 (S.S.A. Jul. 2, 1996). "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Id.* at *4. On the other hand, when there is persuasive contrary evidence in the record, a treating physician's opinion may be rejected in whole or in part. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Generally, the

more consistent a physician's opinion is with the record as a whole, the greater the weight an ALJ will assign to it. *Id.* § 416.927(c)(4): *see, also, Lewis v. Berryhill,* 858 F.3d 858, 867 (4th Cir. 2017) (holding that the ALJ erred in declining to give controlling weight to the opinions of treating sources when the opinions were consistent with other medical opinions in the case, and there was no evidence that the opinions were not well-supported by diagnostic and clinical techniques). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183 (S.S.A. 1996). In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* As such, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special

significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at \*2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at \*3.

In the instant action, the ALJ expressly considered Dr. Zappacosta's opinions regarding Claimant's functional abilities, reviewing her function-by-function assessment. (Tr. at 19). The ALJ did not reject the opinions in their entirety; instead, he gave the opinions only "some" weight. (*Id.*). The ALJ's primary reason for discounting Dr. Zappacosta's opinions was their lack of consistency with the rest of the record; primarily, Dr. Zappacosta's own clinical notes. The ALJ emphasized that Dr. Zappacosta's notes showed significant, sustained improvement in Claimant's symptoms during the relevant period. Furthermore, Dr. Zappacosta repeatedly assigned Claimant a GAF score of 60, which corresponded to moderate impairment at most. (*Id.*). Claimant's statements bolstered the reliability of the GAF scores given that she was able to concentrate on computer games and television for long stretches of time and was able to complete three days of part-time work in a highly social setting. The ALJ conceded that three days of part-time work did not establish Claimant's ability to work successfully on a full-time basis, but explained that the experience suggested that Claimant "could tolerate a less stressful or socially demanding position on a regular basis." (*Id.*). With respect to Dr. Zappacosta's statement that Claimant could not maintain steady employment due to her extreme mood swings, the ALJ indicated that the treatment notes simply did not reflect the severe levels

of depression that previously kept Claimant in bed for several days. All in all, the ALJ found Dr. Zappacosta's RFC assessment and her opinion that Claimant could not work in any capacity to be patently at odds with Claimant's statements, activities, and clinical presentation. (Tr. at 19, 64-65).

Having determined that Dr. Zappacosta's statements were not entitled to controlling, or even deferential weight, the ALJ examined the other medical source statements. (Tr. at 20). He reviewed Ms. Arthur's observations and findings from the consultative examination of Claimant and also gave Ms. Arthur's opinions some weight. The ALJ cited to Ms. Arthur's documentation indicating that Claimant displayed normal social interaction, concentration, persistence, and pace; that Claimant admitted to socializing online, watching television, and playing video games; that Claimant reported feeling comfortable with people after getting to know them; and that Claimant stated that she liked to cook and bake "from scratch." (*Id.*). The ALJ concluded that Ms. Arthur's findings substantially contradicted Claimant's allegations. However, the ALJ reduced the weight given to Mr. Arthur's statement due to the fact that she examined Claimant on only one occasion.

In regard to the agency consultants, the ALJ agreed with their conclusion that Claimant did not have a listing level mental impairment. Therefore, these opinions were also entitled to some weight. Nevertheless, the ALJ discounted the opinions to the extent that the agency consultants felt Claimant was capable of having more social interaction on the job than was suggested by the evidence. The ALJ gave more weight to Claimant's subjective allegations and reports of depressive symptoms than the consultants' opinions and determined that Claimant could have no contact with the public and only occasional contact with coworkers. (*Id.*).

Reviewing the ALJ's analysis of the weight given to the various medical source statements, the undersigned **FINDS** that the ALJ complied with the relevant regulations and afforded weight to each opinion that was consistent with the evidence as a whole. The ALJ complied with the regulations by examining Dr. Zappacosta's opinions to determine whether they were well supported by clinical and diagnostic techniques and were not inconsistent with other substantial evidence. The ALJ found that the opinions were not well supported by Dr. Zappacosta's own documentation, which detailed moderate GAF scores and mild to moderate symptoms. In addition, the ALJ found Dr. Zappacosta's function-by-function assessment to be inconsistent with Claimant's statements and reported activities.

The ALJ correctly weighed Dr. Zappacosta's opinions, as well as the other medical source statements, considering such factors as the length and nature of the treatment relationship, the supportability of the opinions when viewed in the context of the other evidence, and their consistency. Since all of the medical sources specialized in mental health, that factor was not particularly significant. In the end, the ALJ gave all of the opinions some weight. His reasons for not accepting the opinions *in toto* were plainly articulated. The ALJ's rationale for finding Claimant not disabled was clear. Although Claimant had mental health issues, which spanned a long period of time, the treatment notes, the testimony of Claimant's mother, and the statements made by Claimant in the course of treatment all consistently demonstrated that during the relevant period, Claimant's symptoms decreased, her mood improved, and her functional abilities expanded. As she matured, she began to accept the need for regular therapy and psychotropic medication, and when she complied with the treatment regimen, her mood stabilized and her symptoms were controlled. The ALJ did not find Claimant to be entirely

well, nor did he find that she had no functional limitations. As he repeatedly explained at the hearing and throughout the written decision, he believed that Claimant had specific functional limitations related to her mental illness; however, those limitations did not disable her from all work.

The ALJ crafted an RFC finding that took into account Claimant's functional limitations. Using that RFC, the vocational expert was able to find a number of jobs that Claimant was capable of performing. The record supports the ALJ's conclusion that Claimant's symptoms progressively decreased with time such that by the date on which her application for SSI was filed, Claimant's functional abilities were only moderately limited by her mental impairments. Therefore, the ALJ properly weighed the opinions of the medical sources, including the opinions offered by Dr. Zappacosta.

## III.    **Recommendations for Disposition**

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's motion for judgment on the pleadings, (ECF No. 13); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 16); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to

file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** January 3, 2018

Cheryl A. Eifert
United States Magistrate Judge